UNTITED STATES DISTRICT COURT
EASTERN DISRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| **MAMIE HORN APLON**, | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO._____ |
| | § | |
| | § | |
| JASPER I.S.D., CITY OF | § | |
| JASPER, TEXAS, | § | **JURY** |
| *Defendants.* | § | |

## PLAINTIFF MAMIE HORN APLON'S ORIGINAL COMPLAINT

To the Honorable United States District Judge:

Comes Now Plaintiff Mamie Horn Aplon ("Aplon") by and through her attorney Laurence ("Larry" ) Wade Watts, complaining of the following Defendants : Jasper Independent School District ("JISD"); former Superintendent Steve Hyden ("Hyden"); former Assistant Superintendent and current Superintendent John Seybold ("Seybold"); Kelly Davis District Nurse (R.N.) ("Davis"); Kim Miller ("Miller") in her former capacity as aide to Davis; Debra Cordova ("Cordova"); City of Jasper ("City"); Detective Josh Hadnot ("Hadnot"); School Support Officer John Hardin ("Hardin"); Rayburn Broadcasting, LLC ("KJAS") (alter ego of JM Mike Lout), a limited liability company existing under the laws of the state of Texas. For causes of action, Mamie would show the following:

1 _____

1. IDENTIFICATION OF PARTIES FOR SERVICE OF PROCESS:

a.      JISD and Seybold (who is being sued individually and in his official capacity as Assistant Superintendent and de facto Superintendent), may be served with process herein by serving Seybold at his office in the administration building of JISD at 128 Park St., Jasper, TX 75951.

b.      Hyden may be served wherever he is found;

c.      Davis maybe served with process herein at Few Elementary School, 225 Bulldog Ave., Jasper, TX 75951.

d.      Miller may be served with process herein at the campus office of Jasper High School at 400 Bulldog Ave., Jasper, TX 75951.

e.      Cordova maybe served with process herein Few Elementary School, 225 Bulldog Ave., Jasper, TX 75951.

f.      The City maybe served with process herein by serving the City Manager or City Secretary at Jasper, Texas City Hall, 465 S. Main St., Jasper, TX 75951.

g.      Hadnot and Hardin may both be served at the Police Station of the City of Jasper, Texas, 555 S. Main St., Jasper, TX. 75951.

2

/    h.    KJAS may be served with process herein by serving its

Registered Agent, James M. Lout at 765 Hemphill Street, Jasper, Texas

75951.

2. THIS COURT HAS JURISDICTION AND VENUE

a.    This court has jurisdiction pursuant to Title 28 USC, Sections

1331 and 1343.

b.    The acts complained of herein occurred within the geographical

parameters of the Eastern District of Texas, Beaumont Division.

3. PERSONS WITH KNOWLEDGE OF FACTS:

3

A.  Mamie Horne Aplon ("Aplon");

B. "Kelly" Davis ("Davis"), "District Nurse";

C. Kim Miller ("Miller"), Few Primary Nurse's Aide;

D. Debra Cordova ("Cordova"), Few Primary AP;

E. Elaine Lacey ("Lacey"), Few Primary AP;

F. Monica Guillory ("Guillory"), Few Primary Principal;

G. Linda Coleman ("Coleman"), JISD Director Human Resources;

H. Dr. Steve Hyden ("Hyden") (individually and in his former official capacity as Superintendent of the JISD);

I. John Seybold ("Seybold"), JISD, (at the time of incident) former Assistant Superintendent, and now current Superintendent;.

J. John Hardin for Hardin, JPD Policeman/JISD Resource Officer;

K. Josh Hadnot or Hadnot, JPD Policeman;

L. Geneva Birdlong ("Birdlong"), Aunt/Foster Parent of EJ and sister;

M.  J.M. Mike Lout ("Lout"), former mayor and local political figure in business as the owner of Rayburn Broadcasting, call letters KJAS-FM;

4

N. Debbie Foster ("Debbie"), longtime companion and perhaps spouse of JM Mike Lout, and believed to be co-owner of Rayburn Broadcasting, LLC.;

O. Steve Stewart ("Stewart"), broadcaster and "Radio personality", KJAS;

P. Garrett Foster ("Foster"), son of Debbie Foster, and believed to be "foster son"  of JM Mike Lout, employed as "CID Lieut. JPD" and co-owner of local portable building company;

Q. M. CPS Investigator (CPS File Number 72744497)

R. Paternal Grandmother of EEJ, a minor.

S. Pre-K Teacher at Few Elementary School, Lisa Cortelyou.

T. Garth House staff member Heather Wilkerson.

U. Other persons will be identified as they are named to Aplon's counsel.

3. SUMMARY OF CLAIMS PRESENTED BY MAMIE AGAINST ENTITY DEFENDANTS (ENTITY AND INDIVIDUALS) RESPECTIVELY:

A. APLON'S CLAIMS FOR LEGAL AND/OR EQUITABLE RELIEF AGAINST JISD AND JISD STATE ACTORS (INDIVIDUAL AND IN RESPECTIVE OFFICIAL CAPACITIES):

5

1.)     Deprivation, and or Civil Conspiracy to deprive Aplon of rights secured to her by the First, Fourth and Fourteenth Amendments to the Constitution of the United States of America, as set forth with greater particularity hereinafter.

B. APLON'S CLAIMS FOR LEGAL AND/OR EQUITABLE RELIEF AGAINST CITY AND CITY STATE ACTORS (INDIVIDUAL AND IN RESPECTIVE OFFICIAL CAPACITIES):

      1.)   Deprivation, and or Civil Conspiracy to deprive Aplon of rights secured to her by the First, Fourth and Fourteenth Amendments to the Constitution of the United States of America, as set forth with greater particularity hereinafter.

C. APLON'S CLAIMS FOR LEGAL RELIEF AGAINST KJAS and J. M. MIKE LOUT:

      1.)   Civil Conspiracy to deprive Aplon of rights secured to her by the First, Fourth and Fourteenth Amendments to the Constitution of the United States of America, as set forth with greater particularity hereinafter.

4. FIFTY- FOUR (54) EXHIBITS APPENDED HERETO AS APPENDIX ARE INCORPORATED HEREIN. [1]

5.   FACTS :

---

[1]The Exhibits IDENTIFIED IN THE APPENDIX hereto are not offered for the truth of all matters stated therein but as true and correct copies of documents relevant and material to the matters made the subject of this case. Verified on penalty of perjury, and based on personal knowledge of Larry Watts. */S/ Larry Watts*

A. BACKGROUND AND KJAS AND LOUT MOTIVES

1.)     Mike Lout was adversarial to and frequently opposed RC

Horn OR Horn and other African-American leaders, using KJAS, Lout's FAA

licensed radio and online media power as a platform to shape public

opinion along political and apparently racial lines.

2.)     Horn was revered by various White and African-American

leaders in Jasper, including Rev. Walter Diggles of the New Lighthouse

Ministries including the Lighthouse Church of God In Christ.

3.)     Horn was Mayor of Jasper in 1998 when the torture-

murder of James Byrd, Jr. occurred at the hands of three white

supremacists.

4.)     Horn joined with other local, Christian-faith leaders,

including Pastor Walter Diggles, Father Forshage, Pastor Lyons and many

others to unify the Jasper community in peace and goodwill in the wake of

the Byrd murder against the onslaught of racial opportunists or antagonists

descending on the City such as the KKK, and the National Black Panthers.

5.)     Mike Lout had been elected Mayor of Jasper for his first term in 2009, and ran for a second and final term in 2011 being opposed by Horn.

6.)     Debbie Foster's son, Garrett Foster was channeled into law enforcement and became a detective in the police department serving under Capt. Gerald Hall, the second in command in the Jasper PD.

7.)     As a vestige of the goodwill remaining in the community after the terrible murder of James Byrd had brought folks together, the duly elected members of the City Council were as follow: Terrya Norsworthy (At-large District) (African-American); Willie Land (District four) (African-American); Tommy Adams (District 3 ) (African-American); Joe Clyde Adams (District 1) (African-American); and Randy Sayers (White) Mike Lout's accountant.

8.)     In February 2011, Jasper's then Chief of Police, Todd Hunter, announced that he was resigning and moving to Kilgore, Texas.

9.)     Whether to help Garrett Foster or not, Lout preferred Capt. Hall to succeed Hunter and on February 11, 2011 violated various city rules and law to accomplish that by meeting privately with Hall and City

8

Manager Tommy Boykin in the latter's office to inform Capt. Hall that he would be appointed Interim Police Chief and then Police Chief.

10.)  Unaware of Lout's shenanigans, the majority African-American City Council appointed African-American state trooper and Jasper Fire Chief Rodney Pearson as the Interim Police Chief.

11.)  Horn ran for Mayor against Lout and lost decisively in 2011.

12.)  Lout's minion put together a recall election to remove the African-American councilmembers, and Pastor Walter Diggles and others met at the New Light Church of God in Christ to put together a movement to recall lout as the Mayor; the African-American councilmembers were recalled and Lout was not.

13.)  Clearly, Lout did not forget or forgive Pastor Walter Diggles or Horn for their roles in the selection of Pearson as Interim and then regular Police Chief or hosting the organization of a recall Lout effort.

13.)  Meanwhile, Lout used his media platform to launch salvos of criticism and privacy violations against the African-American councilmembers and the new police Chief Rodney Pearson; those events

9

did not overtly involve Aplon's conduct. After all, Aplon was a senior, Highly

Qualified Teacher, recipient of professional awards, who had taught several

stints in JISD, but it is clear to the courts that illegal retaliation will take an

avenger into his antagonist's family or intimate associations.

14.)   Whether fomented by Lout or his self described "girl

friend", Debbie Foster, through Captain Hall or Lieut. Garrett Foster, an

organized disruption of the police department blossomed from within with

numerous officers including Garrett Foster filing EEOC claims and federal

suits against the City of Jasper for reverse racial discrimination by Jasper's

African-American City Council members and Pearson.

10

15.)   Pearson having been fired by the new white majority City

Council, filed suit against Lout, KJAS, Debbie Foster, the City of Jasper, and

various other state actors, under Title VII and the Civil War era civil rights

acts; Pearson settle his claim for $831,000 on or about February 2014.

16.)   In 2015, the FBI, having been alerted to claims of financial

malfeasance by Walter Diggles Pastor of Lighthouse Church of God in

Christ , Executive Director DETCOG and his family in the administration of

federal relief funds obtained indictments of Walter Diggles, his wife Rosie

Diggles, and his daughter Anita Diggles; KJAS covered the federal claims

against the Diggles virtually non-stop and hinted at other potential

unindicted culprits, Lout's on-air voice, Steve Stewart stating on December

22, 2015,

> **"The U.S. attorney's office for the Eastern District of Texas has released the complete indictment against Walter Daigle's, 62, his wife, Rosie Daigle's, 61, and their daughter, Anita Daigle's, 39. The 51 page document not only offers extensive details about what the government is alleging against the family in the 28 criminal charges filed against them, but also repeatedly mentions for unnamed co-conspirators."** (Exhibit 14)

17.)   RC Horn died in his home on July 31, 2016 (Exhibit 13),

and on Martin Luther King Day in 2017, with the Diggles criminal case yet

to be tried, Pastor Diggles publicly named an area at the Lighthouse

Church in honor of RC Horn, presenting a plaque commemorating the

occasion to Aplon. (Exhibit 53)

18.)   During the federal criminal prosecutions of Walter

Diggles, Rosie Diggles, and Anita Diggles in Lufkin, Texas, Aplon was in

attendance comforting her friends, and photographed by Steve W. Stewart

(accompanied by Mike Lout) while she was speaking with Pastor Walter

Diggles; the photo was published on-line at KJAS.com as the featured

photo for story on August 1, 2017. (Exhibit 15)

11

19.)   On August 6, 2017, with a by-line by "Mike Lout and

Steve W. Stewart" KJAS.com's non-stop coverage of the criminal case

against the Diggles family, ran an article captioned, " Guilty, Guilty, Guilty!"

trumpeting the  convictions of Walter, Rosie, and Anita Diggles by a federal

jury in Judge Ron Clark's Lufkin courtroom. (Exhibit 16)

20.)   Mike Lout reportedly exhibits passive-aggressive

behavior, using KJAS, threats, and preemptive aggression against others,

and exacting revenge as able. (Exhibits 17; and 54 ¶ F./ ¶¶ 20, 54).

21.)   KJAS and or Mike Lout knew Aplon: she was a steadfast

friend and openly supported the Diggles family in their criminal justice

travail; she was in her own right beloved and well respected as a teacher in

JISD; she tutored and cooked meals for children after school at Lighthouse

church; she is the daughter of RC Horn who was memorialized by Walter

Diggles in 2017 at Lighthouse church as the namesake for the "*RC Horn*

*Senior Citizens Nutrition and Activity Center*" (Exhibit 53) (Horn being

Lout's political opponent and civic contrast; JISD policies were online and

[that in July 2016, those policies had been updated ] JISD POLICY DFBB

(LOCAL) ¶ 19. states,

**19. Any activity, school-connected or otherwise, that, because of publicity given it, or knowledge of it among students, faculty, or the community, impairs or diminishes the employee's effectiveness in the District.**

22.)   KJAS and Lout, having the motive to harm RC Horn whom he had privately identified as an "unnamed co-conspirator" (Exhibit 14) in the Diggles case, had the motive to harm Horn's memory and daughter Aplon as was happening to Walter Diggles.

23.)   KJAS and Lout set about to test the parameters of negative publicity which could be dished onto Aplon to have her disgraced and fired from JISD.

24.)   With Garrett Foster in a decision-making and command staff position as a lieutenant in the City PD, and reportedly sympathetic JISD administrators in place, KJAS and Lout only had to await the opportunity to give Aplon unwanted negative publicity (Exhibit 44), and the conviction of the Diggles family members.

25.)   Diggles was convicted on or about August 6, 2017, and his case went on appeal to the United States Court of Appeals for the Fifth Circuit.

13

26.)   No longer Mayor, Mike Lout fell out politically with his accountant and former friend Randy Sayers, also a former Mayor, on November 21, 2017; a political disagreement reached a tipping point when Lout went to Sayers office to collect his records. Louts abusiveness caused Sayer to stand up from his desk, and the uncontrolled Lout "sucker-punched" the unsuspecting  Sayers in the face. Lout immediately used his media power to spin his side of the story. This event is relevant to understanding Lout's personality and conduct in harming Aplon as complained of herein. (Exhibit 17)

27.)   On January 25, 2018, it appeared that KJAS' opportunity to produce negative publicity for Aplon might occur with two kindergarten children in her class; a White female child kissed an African-American male child. Aplon responded and admonished both children without any touching or corporal punishment being involved. Later, the female child's parent complained that Aplon had hit her daughter (Exhibit 18), but investigation by the administration found the charge to be unfounded.

14

28.) Meanwhile, the Diggles defendants lost on appeal and were being processed by the Justice Department.

29.) On April 20, 2018, Father Ronald Foshage, St. Michael's

Catholic Church wrote to United States Senior District Judge Ron Clark

regarding Walter Diggles and Mayor R.C. Horne,

> In 1998 when James Byrd, Jr. was dragged to his death here in Jasper, the Ministerial
> Alliance met frequently that entire summer planning peace rallies and prayer vigils.
> Walter and Dr. Kenneth Lyons, James Byrd's pastor, were key figures in those meetings.
> **When the KKK and Black Panthers came to Jasper, our Ministerial Alliance met
> frequently with the Police Dept. and Sheriff's Dept. hoping to hold our community
> together. Walter played a key role in those tense days. When the trials of the three
> men accused of the crime began, Walter again played a key role. He assisted our
> Mayor, R.C. Horn, in addressing the dozens of television and radio networks that came
> to town. Walter also visited Mr. and Mrs. Byrd each evening in their home during the
> trials giving them support and keeping them up-to-date on all that was happening
> around us. He was a pillar of strength especially when he met with the Black Panthers
> and the KKK along with so many influential people from throughout the country who
> came to our community during those tragic days. As ministers, we often prayed
> together and supported one another. I believe our Ministerial Alliance, composed of
> African-American and white ministers, played a role in keeping the peace in our
> community. ..**

15

30.) On May 2, 2018, Royce Garrett, a 44 year employee of the

Lufkin State School and former Member of the Board of the Deep East

Texas Council of Governments ( " DETCOG") wrote to United States Senior

District Judge Ron Clark regarding Walter Diggles and Mayor R. C. Horne,

> **Mayor R.C. Horne was president of  DETCOG and President of the DET Foundation in
> 2005 when the hurricanes hit Louisiana and Texas. His work with the DET Foundation
> was approved by the  Board of Directors, and how he could be linked to a crime by
> serving meals  and helping at-risk youth in accordance with the contract and
> just like so  many other organizations, is so unfortunate. He died after being
> interviewed three times by the FBI! When this story is told and the discovery is
> revealed to the world, somebody will be asking the same question I have for you
> Judge. Was this a racially motivated and politically motivated case to punish the**

minority members of the DETCOG staff, the Lighthouse Church Volunteers, and the Diggles family?

B. BEGINNING THE 2019-2020 SCHOOL YEAR FOR APLON AT FEW

1.)    Aplon received a 10 month basis, customary One-Year Term Contract For Classroom Teacher   for the 2019-2020 school year. (Exhibit 20).

2.)    Few Elementary School ("Few") during the 2019-2020 school year was staffed and salient part as follows:

a.)    Principal Monica Guillory (African-American);

b.)    JISD's District Nurse (RN) Kelly Davis (White) officed at Few;

c.)    Assistant Principal Deborah Cordova or Cordova (White);

d.)    Assistant Principal Elaine Lacey or Lacey (White);

e.)    Counselor Lenette Foster ("Foster") (African-American);

16

f.)     Kindergarten teacher Aplon[2] (African American);

g.)     Pre-K teacher Lisa Cortelyou[3] (White);

h.)     Aide to nurse, Kim Miller ( White).

3.)     During the 2018-19 school year *E J*, an African-American male, approximately four years old, Regular Student, was in Few Pre-K, in classroom of Lisa Cortelyou, and is anecdotally recalled as having significant behavioral problems, about which his Teacher spoke to Aplon.

4.)     At the beginning of the 2019-20 school year, *E J* was assigned to Aplon's class, as a Regular Student.[4]

5.)     Within approximately two weeks of the beginning of school, in addition to his usual "anomalous behavior", *EJ* was not only

---

[2] Of the approximately 8 kindergarten teachers at Few during the time period of the events made the subject hereof, only one was African-American, Aplon.
[3] Of the approximately 5 prekindergarten teachers at Few during the time. Of the events made the subject hereof, only one was African-American, Ms. Williams.
[4] The term Regular Student differentiates *EJ* from being a Special Needs/Education/IDEA Student.

defecating in his clothes, smearing it on desks, but throwing his feces on other students said *EJ* was sometimes putting the feces in his mouth.[5]

6.)    Aplon went to Counselor Foster and told her *EJ* was *defecating ("Boo Boo")* in his clothes, and how she would have  to change and clean him up in the classroom's toilet, and that additionally Aplon's aide, Bridgett would take *EJ* to District Nurse Davis (and her Nurse's aide Miller) to examine and clean *EJ*.

7.)    Counselor Foster said that Davis and the entire Pre-K staff as well as the Principal knew about *EJ* defecating and "playing with it" and that she, Foster had reported the matter to Principal Guillory several times.

18

8.)    Aplon said she "..HAD NOT KNOWN ABOUT *EJ's* PROBLEM UNTIL HE ARRIVED IN [HER] CLASS! AND SOMETHING NEEDS TO BE DONE FOR THE CHILD!" Aplon further said that she intended to go personally to Guillory to address *EJ's* problem.

---

[5] The symptoms described are associated with Coprophagia, reported to be a relatively rare disorder associated with neurological and psychiatric disorders.

9.)	Counselor Foster repeated that she had reported the matter to Principal Guillory but that maybe it would be helpful if Aplon would also go to Guillory.

10.)	Aplon soon went to Principal Guillory and told her, *EJ* was not only defecating in his clothes, smearing it on desks, throwing his feces on other students, but some of the students said *EJ* was sometimes putting the feces in his mouth; Principal Guillory said she would "check on it and handle it".

11.) Aplon returned to Counselor Foster and told her that she, Aplon had gone to Guillory and she was going to give it a little time to get handled; Counselor Foster later told Aplon that she had again gone to Principal Guillory and that the child's problem was well known to the Pre-K department, Nurse Davis, Principal Guillory and the assistant principals. Counselor Foster said everybody knew but they weren't taking any action and she had no authority to supersede the Principal.

12.) Aplon and Counselor Foster regularly discussed the fact that nothing was being done to diagnose and assess *EJ's* issues.

19

13.)   Principal Guillory would periodically stop in Aplon's class for a few moments but nothing more happened in terms of helping *EJ*.

14.)   Aplon never saw *EJ* put the feces in his mouth, but when she became aware he had "Boo boo'ed" in his clothes, she would take him into the restroom in her classroom, clean him up, change his clothes and examine to see whether he had the feces on his face or body.

15.)   When Aplon was working with other children, and *EJ* was soiled with defecation, she would ask her aide to take him to Nurse Davis.

16.)   At all times material hereto, Nurse Davis' job description and duties as the RN, and District Nurse, particularly stationed to address the Few student population, including *EJ* are listed on Exhibit 56.

17.)   At all times material hereto, Principal Guillory's job description and duties as the Few Principal are listed on Exhibit 58.

18.)   Aplon's aid told Aplon that Nurse Davis and her Aide were refusing to touch or clean *EJ,* telling the child to go into the Nurse's restroom and clean himself and change.

19.)   September 25, 2019, was the first time that Aplon had personally escorted *EJ* to Nurse Davis' office.

20

C. SEPTEMBER 25, 2019

1.)     Aplon was with was on the playground with her students

on September 25, 2019. (Exhibits 22, 28, and 34)

2.)     The group of boys got into trouble on the playground and

*EJ* was one of them; Aplon made the boys sit in timeout for five minutes.

(Exhibits 22, 28, and 34)

3.)     Aplon began eating her lunch which consisted of a Kiwi

fruit, which she ate with the spoon. (Exhibits 22, 28, and 34)

4.)     *EJ* approached Aplon, and smelled as if he had soiled his

pants; Aplon threw the Kiwi on the ground but kept the spoon in her hand,

leading the child to Nurse Davis' office. (Exhibits 22, 28, and 34)

5.)     Nurse Davis and her aide, Kim Miller realizing what

happened exchanged comments with Aplon; Davis and Miller each falsely

describe events in the clinic in part by saying that Aplon said she was going

to make the child eat his Boo-boo with the spoon. Davis gave *EJ* some

Wet Wipes, and sent the child to the bathroom to clean himself.

6.)     Aplon was shocked at the Nurse's insensitivity, registered

displeasure on her face, then followed *EJ* into a small restroom to help him;

Aplon partially shut the door because two children were on the bed in the nurse's office. (Exhibits 22, 28, and 34)

7.)  Aplon still had the spoon, and while she was helping *EJ* clean up and change clothes, Aplon told the child to be careful he was getting the Boo-boo on his clean clothes, she laid the spoon down while helping him. (Exhibits 22, 28, and 34)

8.)  The spoon touched something so she wrapped it in a Wipe (Exhibits 22, 28, and 34), and put his soiled clothes in a clear plastic bag to put in his backpack. (Exhibits 22, 28, and 34)

9.)  Aplon talk to the child and told him about things not going his way into stop doing this in his clothes. (Exhibits 22, 28, and 34)

10.) Aplon never said that she was going to make him eat it or words to that effect and denies making *EJ* eat his feces. (Exhibits 22, 28, and 34)

11.)  When Aplon left the nurse's clinic with Nurse Davis and her Aide Miller, it was clear that Aplon was unhappy with the way the child had been treated.

22

12.)   Assistant Principal Cordova told School Resource Officer Hardin that she and Assistant Principal Lacey for stating in the main front area of the campus and Nurse Kelly Davis waved us to come to her. Davis told the two she needed to talk to them about a situation and the trio went to Lacey's office where Davis told them that EJ had soiled himself and his teacher Mamie Aplon told her and nurse's aide Kim Miller, "I'm gonna make him eat it" referring to his own excrement. Cordova then said that Nurse Davis entered Cordova's office and Cordova called Principal Monica Guillory who was at a training in Houston, and reported the incident to her. Cordova says that Guillory gave her "urgent steps to follow that included: securing the student with her, calling the School Resource Officer to file a police report, filing a report with CPS, and looking for the alleged spoon that Nurse Davis reported seeing Ms. Aplon with when she entered the restroom with [EJ]" Cordova says that she received a phone call from Lynda Coleman, Human Resource director who instructed Cordova to find "cover for Ms. Aplon's class and send her to Central Office." (Exhibit 24)

13.) Cordova recalls that while she and Miller and Davis were talking about the spoon and getting trash from the bathroom, "Ms. Aplon appeared back in the nurse's office with EJ's soiled clothing wanting to

23

know if someone was going coming to pick them up. I explained that he had
to change again because he had wet (sic) himself again, to just leave the
clothes. [Ms. Aplon] left and went back to her classroom. Cordova also
wrote, "Ms. Lacey and I interviewed the student about the incident. See
Attached statement." (Ibid.); however, Cordova reported that on September
30, 2019 at approximately 1:15 PM, a kindergarten teacher brought EJ to
the office. In her report card overstates the following:, He stayed with Mrs.
Harris in the Principal's office until I could arrive. I arrived approximately
1:20 PM and saw EJ running around the office shutting doors, turning off
lights, and talking back to Ms. Harris. I told EJ to come with me and he
said,' no, you will call the police.' I told him I would not call the police on
him and he said, yes you have.' He finally came to my office and sat down. I
was asking him why he was brought to the office and he would not answer
me. EJ then put his hands down the back of his pants and we pulled it out
he had poop on his fingers. He looked at me and then stuck his fingers with
the poop on them in his mouth. I jumped literally and grabbed his forearms
to keep him from doing it again and took him into the nurse's office. Nurse
Davis proceeded to wipe his hands and arms clean with wipes. Once they
clean his arms, they tried to get him to change clothes but he was fighting

24

the nurse and nurse's aide. EJ tried to come back to my office and I took him back to the Nurse. They were able to get him changed and cleaned up but not without him hitting and kicking them. I spoke to Aunt and she said let her know if he still acted up. At 1:50 PM I called Geneva Birdlong back because EJ was fighting and kicking and spitting on Nurse Davis and Mrs. Miller. I assisted Mrs. Miller and trying to get EJ to brush his teeth but was not successful. We then washed his mouth with Scope via a syringe. Ofc. Hardin arrived and helped diffuse the situation. Aunt arrived and took him home." (Exhibit 30)

14.) In contrast with what Nurse Davis and Aide Miller attributed to EJ, and to what Cordova claims to be a transcript of an interview with EJ where EJ speaks responsively, Hadnot recalls the following: "*On Friday, September 27, 2019 at approximately 0930 hours we arrived at the Garth House for the interview that was conducted by Heather Wilkerson with EJ. Heather's interview is audio/video recorded as she engages EJ to attempt to obtain information from him. EJ is five years of age but is hard to understand when he replies to Heather's questions. Heather tried to explain the aspect of truth and lies EJ which he did not know the difference as his lack of attention and ability to sit still in the chair were very big distractions*

25

*especially in this type of setting. EJ did not understand the difference in*

*animals even when showed pictures of them by Heather in the early stages*

*of the interview and he had no idea why he was at the location. I instructed*

*Heather to ask EJ direct questions about school and any accidents he may*

*have had recently on himself as EJ denied ever being in trouble at school*

*or home along with having any accidents on himself. EJ also answered*

*questions that Heather made up to build rapport and other things that he*

*had no idea the answers to them as they were lives. With the interview*

*hitting roadblocks as EJ was not forthcoming with any information at all I*

*instructed Heather to end the interview which she did.*" (Exhibit 35, Page 3

of 6)

26

      15.)   But Hadnot made the following statement: "Upon

reviewing the Texas Penal Code the charge of Official Oppression 39.03 (M

A) appears to be the fitting charge if prosecutors and grandeur of ours

deem it appropriate..." and bases that upon the statement offered by him as

probable cause, "After obtaining the audio/video recording [of Heather

Wilkerson's interview of EJ] that will be added to this case is evidence along

with two written statements by Apolon (sic) and several other statements

from JISD administrators pertaining to their contact with Apolon (sic) there

are conflict being statements made by Apolon (sic) as to the events that took place regarding the spoon, or statements in the nurse's office in front of two witnesses, and her actions." (Exhibit 35, Page 5 of 6 through 6 of 6).

16.)   Hadnot further states, "As a certified teacher the Texas Education Agency will be notified by either JISD staff or myself due to the nature of the incident and its criminal capacity." (Exhibit 35, Page 6 of 6).

17.)   Hadnot was on the JISD School Board from May 27, 2015, through 2017, when he stood for re-election to the JISD Board and was defeated; Detective Hadnot has stated that JISD was the complainant prompting the arrest and prosecution of Aplon. (Exhibit 59)

18.)   At all times material hereto, City PD Detective Sergeant Hadnot has been a supervisee of City PD Lieutenant Garrett Foster, and recipient of favorable publicity by KJAS, making him beholden or sensitive to the wishes of KJAS and Lout.

19.)   On November 1, 2019, KJAS wrote a story entitled, "G.I. SDT teacher indicted and arrested, more info expected on this developing story" stating, "a long time Jasper teacher was indicted by the Jasper County Grand Jury on Thursday and was arrested by Jasper Police on

27

Friday. 67 year old Mamie Robinson Aplon has been charged with one

class a misdemeanor count of Official Oppression. Sources close to the

investigation say that the alleged incident involved a student at Few Primary

School, where Aplon is a teacher. Aplon, who is the daughter of former

Jasper Mayor RC Horn was arraigned by Jasper County Judge Mark Allen,

the center bonded $10,000." (Exhibit 36)

20.) Also November 1, 2019, K JAS filed its initial story with a

second online article entitled, "G.I. SDT teacher indicted and arrested,

accused of making child eat his own feces... The indictment said Aplon'. Did

then and there intentionally subject EJ (pseudonym) to mistreatment that

the defendant knew was unlawful, namely causing EJ to eat his own feces,

and the defendant was then and there acting under the color of her

employment as an educator'. Aplon is a teacher at Few Primary School on

bulldog Avenue, and the daughter of the late RC Horn, who served as

mayor of Jasper. Aplon was arraigned by Jasper County Judge Mark Callan

on Friday and her bond was set at $10,000 (Exhibit 37)

21.)   The misdemeanor charge in cause number JC 35337 was

filed in the County Court of Jasper County, Texas and was defended by Ms.

Aplon through her attorney Jonathan D. Goins. (Exhibit 41)

28

22.)   On November 25, 2019 JISD's attorney Haley E Turner wrote an email to Aplon's attorney giving her a chance to resign on or before December 31, 2019 and stating that Aplon would remain on administrative leave with full pay and benefits through that date; Turner also suggested to Aplon's attorney that he hire one of three lawyers that were extremely trusted and respected by Turner's law firm (undersigned counsel's name was not amongst the three) (Exhibit 42)

23.)   On March 12, 2020, JISD's Superintendent Hyden sent a letter to Aplon via certified mail and regular mail "RE: Recommendation for Nonrenewal of Term Contract" stating in part "You have been on administrative leave with pay since September 25, 2019, following an incident of inappropriate student communication. I will be presenting my recommendation for the nonrenewal of your 2019-2020 term contract to the Board at the Board meeting on April 20, 2020. I will ask that the Board take action at that meeting to initiate the nonrenewal of your contract." (Exhibit 43); however, no reasons for the basis of the intended nonrenewal by Hyden were given.

24.)   On April 28, 2020, J ISD's Superintendent Hyden sent a letter to Aplon via certified mail and regular mail, stating in part, "You are

29

hereby notified that the Jasper ISD Board of Trustees has voted to propose the nonrenewal of your term contract at a lawfully called meeting of the Board on April 20, 2020. This action was taken on my recommendation that your term contract of employment not be renewed. This notice is given pursuant to the provisions of Section 21.206 of the Texas Education Code. The recommendation not to renew your contract is [appears to be intentionally obscured] for the following non-exhaustive list of reasons from JISD Board Policy DFBB (Local)..2. Failure to fulfill duties or responsibilities... 6. Failure to comply with Board policies are administrative regulations... Failure to meet the District standards of professional conduct, including Board Policy DH (LOCAL) and the Educators Code of Ethics in Board Policy DH (EXHIBIT)..[And].. Any activity, school connected or otherwise, that, because of publicity given it, or knowledge of it among students, faculty, or the community, impairs or diminishes the employees effectiveness in the District... If you desire a hearing, you must notify the Board of Trustees in writing of such request not later than the 15th day after your receipt of this written notice." (Exhibit 44)

30

25.)   USPS documents revealed that although Hyden's April 28 letter was posted on April 29, 2020 it was signed by Aplon but instead said "**Covid 19 M. Aplon 5 – 1 – 20**".(Exhibit 45)

26.)   On May 22, 2020, J ISD's Superintendent Hyden sent a letter to Aplon via First Class and Certified Mail RRR No. 70190700000136350987 which said in part, "You are hereby notified that at a meeting of the Jasper ISD Board of Trustees, on April 20, 2020, the Board voted to nonrenew your 2019-2020 term contract. The Board directed me to provide you with this notice in accordance with Texas Education Code Section 21.208 and Board Policy DFB B (Local)... The Board did not receive a request for hearing from you within 15 days of the date you received the notice of proposed nonrenewal. As a result, the Board took action to finally nonrenew your contract... I appreciate your service to the students of the Jasper ISD and wish you luck in your future endeavors." (Exhibit 46)

27.)   USPS documents show that Hyden's May 22, 2020 letter was posted on May 22, 2020 (Exhibit 47).

31

28.)   USPS tracking documents show that Hyden's May 22,

2020 letter was ostensibly delivered on June 1, 2020. (Exhibit 48).

29.)   Mr. Goins on behalf of Aplon submitted to the Jasper

County District Attorney documents on April 29, 2020 which included: an

affidavit of Lenette Foster, school counselor at Few Primary who said that

she spoke with EJ concerning the incident that happened with Ms. Aplon

and asked him did he eat his boo-boo to which he replied "I did not eat

boo-boo". I asked him did Ms. Aplon feed boo-boo to him? He said, "No".

(Exhibit 49A); a report of POLYGRAPH Examination of Aplon conducted on

December 20, 2019 "Specific Issue-Official Oppression" of retired Federal

Examiner of the U.S. Department of State and U.S. Department of Justice,

John S. Swartz, showing no deception by Aplon in denying "ever making

the child eat his own feces." (Exhibit 49B); a letter from Mervin Cleveland

stating in part, "I am a 39 year retired educator of Jasper ISD with 21 of

those years in administration and also a retired juvenile Probation Officer

with seven years of service. I am writing this letter on behalf of Ms. Mamie

Alpon (sic). I have known Ms. Alpon (sic) for over 40 years during this

length of time, she has always presented herself as a loving person. She is

always presented herself as a person who love children. She has a

32

reputation as being a child advocate who not only wanted her students to be well educated but she always looked out for the well-being of all children. She is a community minded person. In any event that deals with the youth of the community will find Ms. Alpon (sic) as one of the front runners. She is involved in organizations such as Black Girls Rock, Senior Citizens activities, Basketball Camp, Lunch programs to support summer youth, Loan*District Association Youth Director, member of the Pillar of the Community, Top Teen students of distinction, member of the Foreign Scholarship Organization. Organizer of the Blot Party of regular and special need youth just to name a few." (Exhibit 49C)

   30.)   The Motion to Dismiss by the Assistant Criminal District at Attorney Carol Dillon for the State of Texas on November 20, 2020 of the charge of all OFFICIAL OPPRESSION (MA) against Aplon "due to the State's recent receipt of additional, exculpatory evidence...", and the filed dismissal order signed by the Presiding Judge. (Exhibit 50).

   D.    IT IS NOT OVER..THOSE WHO WANTED REVENGE WON!

   1.)    Aplon as applied to JISD for employment without acknowledgment from the entity.

2.)      Aplon and Counselor Foster had each petitioned Nurse

Davis and or Principal Guillory to provide [special education program

support] for EJ, unsuccessfully.

3.)      Shortly after defendants were able to deprive Aplon of her

career as an educator by suspension on September 25, 2019, J ISD quietly

placed EJ and special education/IDEA/Life Skills.[6]

6.    CAUSES OF ACTION :

A.    Constitutional rights implicated herein:

1.)      First Amendment[7],

a) Intimate association with Lighthouse Church of God in

Christ, and/or Pastor Walter Diggles/Rosie Diggles/ Anita Diggles; and or

---

[6] Still, the psychological/psychiatric support needed by the child
EJ has not been secured or offered by defendants or any one of
them.
[7] Aplon has spoken both expressively and verbally as a citizen, on
matters of public concern, in non-disruptive manners -publicly
and privately (both of which methods are protected)-and those
exercises have each substantially motivated each defendant to
retaliate against Aplon, but for which she would not have been
subjected to retaliation.

b.) Expressive speech in her appearance at the criminal trial against the Walter Diggles family, sufficient to be noted by a photograph made by KJAS, Steve W Stewart and Mike Lout; and or

c.)    Expressive speech in her facial objections to and rejection of the treatment of EJ by Nurse Davis (in violation of her core duties), and Kim Miller; and for

d.)    Speech to Counselor Lenette Foster and/or Principal Monica Guillory critical of JISD's failure to care for the needs of EJ [in compliance with the Constitution of the State of Texas or federal law].

2.)    Fourth Amendment

a.) Seizure by arrest and requirement of bail at $10,000.00, for official oppression (ma) without probable cause, and maliciously prosecuting Aplon for official prosecution (ma).

3.)    Fourteenth Amendment

a.)    Deprivation of constitutionally protected liberty interests without substantive due process.

35

b.)     Deprivation of constitutionally protected interests

without procedural due process.

4.)     Denial of Equal Protection

5.)     Individual Defendants are respectively Not Entitled to

Qualified Immunity.

6.)     All defendants have acted together in civil conspiracy to

violate the Constitutional Rights of Aplon.

7.     RELIEF SOUGHT

A. DECLARATORY AND EQUITABLE

36

1.)     A declaration by the Court defendants have each violated

the Constitutional Rights of Aplon;

2.)     Injunctive relief, both temporary and permanent

mandating Aplon's reinstatement to her teaching position at JISD, and the

expungement of all subject records maintained by any entity.

3.)      Actual Damages;

4.)     Exemplary damages when and where legally allowable for

malicious conduct of individual defendants to make an example of them for

desecrating sacred Constitutional Rights of the First, Fourth, and

Fourteenth Amendments.

      5.)    Reasonable and necessary attorney's Fees and Costs.

      6.)    All other relief whether in law or equity to which Mamie

Horne Robinson Aplon is entitled under the law.

               Respectfully submitted,

               */S/L WATTS*

               Laurence ("Larry") Wade Watts
               SBN 20981000 FID 7092
               Watts & Company, Lawyers, Ltd.
               P.O. Box 2214
               Missouri City, Texas 77459
               Ph. (281) 431-1500
               Fax (877) 797-4055
               Wattstrial@gmail.com
               COUNSEL FOR MAMIE APLON

37

1.) JISD is a school district which has a history of apparent Constitutional and statutory compliance failures.

2.) JISD's compliance failures are appreciated by taking notice of the following facts:

   a.) All states by the Fourteenth Amendment are Constitutionally mandated both federally and state to provide substantive and procedural due process to every person before depriving that person of a triggering Constitutional interest; and the state or its sub-political parts cannot act arbitrarily or arbitrarily fail to comply with constitutions, statutes, entity rules, without reasoned analysis.

b.) The State of Texas is Constitutionally mandated to provide to persons between the ages of _____through _____, a "free and appropriate" public education.

c.) The United States District Court for the Eastern District of Texas, United States District Judge William Wayne Justice issued an order in *United States v. Texas ,*321 F. Supp. 1043, 10588 (E.D. Tex . 1970) (hereinafter "5281") succinctly described by its author as follows,

> Plaintiff United States of America filed this lawsuit against the State of Texas and TEA on March 6, 1970, alleging that the State of Texas had prevented the dismantling of the former dual system by, *inter alia,* funding transfers of white students leaving predominately minority schools and school districts to attend predominately white ones. As a result, the Court ordered TEA to reevaluate and revamp its programs and policies "to insure that no student in Texas will be effectively excluded from equal educational opportunities based on race, color, or national origin and that the dual school system heretofore maintained will be eliminated root and branch." *United States v. Texas ,*321 F. Supp. 1043, 10588 (E.D. Tex . 1970) (citing *Swann v. Charlotte-Mecklenburg Bd. of Educ.,*402 U.S. 1, (1971), *aff'd as modified,*447 F.2d 441 (5th Cir. 1971), *cert. denied,* 404 U.S. 1016 (1972).

*U.S. v. State*, Civil Action No. 6:71-CV-5281, at *2-3 (E.D. Tex. Aug. 4, 2005)

d.) 5281 was revisited by Judge Justice lamenting the failure of the State's implementation of 5281,

> As the plain meaning of the Court's 1970 Order makes clear, the Court ordered a *statewide remedy* to what it found was a *statewide* violation: TEA's actions in impeding desegregation of local school districts throughout

Texas, The fact that some school districts in Texas might have also been directly ordered to desegregate in another case did not insulate those districts from the statewide relief granted in 5281. Indeed, the Court was well aware that individual lawsuits might be insufficient given TEA's misconduct, especially when inter-district transfers were involved.

In many manners involving segregated public schools, it is unnecessary to seek relief against a state agency, since local authorities ordinarily possess the requisite authority to eliminate segregation which is confined within the boundaries of individual school districts . . . *[B]ecause of the contribution to the continuation of vestiges of segregation made by TEA as exemplified by its support or of its acquiescence in both territorial and scholastic transfers, the relief in this case must also involve the general administration of public education by [TEA] and its use of its power to compel compliance with Federal law at all levels of the public educational system.*

*United States v. Texas,* 321 F.Supp 1043, 1058 (E.D. Tex. 1970), aff'd and modified, 447 F.2d 441 (5th Cir. 1971) (emphasis added).

*U.S. v. State*, Civil Action No. 6:71-CV-5281, at *8 (E.D. Tex. June 22, 2005)

40

e.) The State of Texas' continued it's large and small circumventions of 5281 over the years after 1971, ghosting TEA's original culpabilities with educational voucher and Charter School programs, continuing the state endorsed "*territorial and scholastic transfers"*, and financially starving  tax supported public education by state defunding public education causing massive Reductions In Force of "class protected" or minority staff.

f.) By the Texas Legislature's passage of Senate Bill 7 in 1993, Texas officially recognized the existence of a race and economic based education

gap (hereinafter the "Achievement /Equity Gap") in Texas public schools and ordered that Gap's closure.

g.) The Texas Supreme Court ordered the State to provide [adequate financing for the delivery of a free and appropriate public education], affirming Senate Bill 7, despite the secular inclinations of the state's actors involved in the educational process.

h.) The federal and state courts, and maybe the state government, have recognized that there has been a pre-existing system of disparate delivery of public education in Texas.

i.) The State of Texas then to minimize the focus on the racial factor in its disparate delivery of public education to minorities, misdirected the attention of the public to educational achievement and testing through the development of .

j.)

41

f.) where the testing was being "dumbed-down" to placate the tests'

crticis and allow local school districts to under-educate with the   issues of

disparity as being race based and not  sufficiency

educational

    e.)

    e.)

B. RELEVANT DESCRIPTION OF CITY

C. RELEVANT DESCRIPTION OF MAMIE